UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

|  |  |  |
|---|---|---|
| MICHAEL LAND, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 4:04-cv-158 |
| | ) | |
| v. | ) | Honorable Nancy G. Edmunds |
| | ) | |
| PFIZER, INC., et al., | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendants. | ) | |
| | ) | |

This is an action for benefits brought pursuant to the Employment Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1461, by two former employees of the Diagnostics Division of Pharmacia Corporation. This court has jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(a)(1)(B). Plaintiffs seek benefits under the Pharmacia Separation Benefit Plan. Additionally, they allege that they are entitled to extended stock option exercise periods under a Pharmacia document entitled "Understanding Your Stock Options." Plaintiffs initiated this action by filing a complaint asserting breach of contract claims under state law. By opinion and judgment entered June 17, 2005, former District Judge David W. McKeague determined that plaintiffs' state-law claims under both the Separation Plan and the stock option document are preempted by ERISA and must therefore be dismissed. Judge McKeague thereafter granted plaintiffs leave to file an amended complaint, asserting claims under ERISA. (Order, docket # 28). Plaintiffs' ERISA claims are now embodied in a second amended complaint. (docket # 38).

By case management order entered December 1, 2005 (docket # 44), the court determined that the procedures set forth by the Sixth Circuit in *Wilkins v. Baptist Healthcare Systems, Inc.*, 150 F.3d 609 (6th Cir. 1998), govern the adjudication of all claims in the second amended complaint. Pursuant to the *Wilkins* procedure, the court's review under ERISA must be based upon the administrative record. The parties stipulated that no factual development or discovery was necessary with regard to any of plaintiffs' claims, and that any appropriate factual context would be supplied by factual stipulation. The parties have now filed an agreed administrative record ("A.R." docket # 51), a first stipulation of facts ("First Stip." docket # 49), and a supplemental stipulation of facts ("Suppl. Stip." docket # 62). In addition, each party has filed a brief addressed to the merits of plaintiffs' claims, and plaintiffs have submitted a rely brief.

By order of reference entered April 10, 2006 (docket # 57), Honorable Nancy G. Edmunds, visiting district judge, referred the matter to me for the filing of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). I conducted oral argument on May 3, 2006. For the reasons set forth below, I conclude that plaintiffs' claim under the Separation Plan is not supported by the Plan, but that their claim for an extended stock option period is meritorious and should be granted.

## **Proposed Findings of Fact**

### Parties

1.      Plaintiff Michael Land and plaintiff Dennis Kane are residents of Kalamazoo County, Michigan. (First Stip., ¶¶ 1, 2).

2.      Defendant Pfizer, Inc. is a Delaware corporation with principal place of business in New York. (First Stip., ¶ 3).

3.      Defendant Pharmacia Separation Benefit Plan is an employee benefit and welfare plan within the meaning of 29 U.S.C. § 1002(1) and is governed by the provisions of ERISA.

4.      At all relevant times preceding the events giving rise to this lawsuit, plaintiffs Michael Land and Dennis Kane were employees of Pharmacia Diagnostics, Inc., a wholly owned subsidiary of Pharmacia Corporation.

<u>Separation Plan</u>

5.      Before the events giving rise to this lawsuit, both plaintiffs were covered by the Pharmacia Separation Benefit Plan ("Separation Plan," A.R. Ex. 1). The Separation Plan is a 22-page document that describes in detail, among other things, the circumstances under which an employee may be eligible for benefits, the exclusions to eligibility, the amounts and types of benefits, procedures for departures from the otherwise applicable benefit schedules, claim and appeal procedures, and the discretion and duties of various entities involved with the administration of the Separation Plan. The Separation Plan was amended effective July 29, 2002, and December 23, 2002, prior to and in anticipation of the acquisition of Pharmacia Corporation by defendant Pfizer, Inc. (First Stip., ¶ 11).

6.      The Separation Plan and its amendments were issued and distributed to all Pharmacia employees, including plaintiffs. (First Stip., ¶ 12). In addition, each employee received a copy of a summary plan description (SPD) summarizing the provisions of the Separation Plan. (A.R., Ex. 2).

7.    Entitlement to severance benefits is governed by the terms, conditions and definitions set forth in Articles I, II, and III and other provisions of the Separation Plan.  The principal Plan provisions relevant to the present dispute are as follows:

(a)    The purpose of the Separation Plan was to alleviate financial hardships experienced by certain of the employees of Pharmacia Corporation whose employment would be terminated at the initiation of the Company.  "In essence, benefits under the Plan are intended to be supplemental unemployment benefits."  (Separation Plan, § 1.02).

(b)    As used in the Separation Plan, the term "Company" means Pharmacia Corporation and its affiliates that adopt the plan.  (Separation Plan, § 2.05).

(c)    The eligibility provisions of the Separation Plan (§ 3.01) extend benefits to any "Terminated Employee" whose services are terminated by reason of, among other causes, "Termination Due to Change in Control."[1]  (§ 3.01(a)).  Each of these terms is specifically defined by the Separation Plan, as follows:

(i)    A "Terminated Employee" is an employee who has experienced an "Employment Termination Date."  (§ 2.23).

---

[1] Of the three triggering events for eligibility envisioned by the Separation Plan (termination by reason of non-performance, termination due to workforce restructuring, or termination due to change in control) only termination due to change in control is relevant to the present case.  The definitions of the other triggering events are therefore ignored herein.

(ii)      An "Employment Termination Date" is the date on which the employment of the Employee by the Company is involuntarily terminated.  (§ 2.12).

(iii)      "Termination Due to Change in Control" means termination of an employee's employment "by the Company within two years following a Change in Control that is involuntary or that is as a result of his or her rejection of an offer of continued employment with the Company or an affiliate if such employment is not a Comparable Position."  (§ 2.24).

(iv)      A "Change in Control" can occur in a  number of situations, including the acquisition by any person of beneficial ownership of thirty-three percent or more of the outstanding shares of common stock of Pharmacia, the reorganization, merger, or consolidation of Pharmacia, or the sale or disposition of all or substantially all of Pharmacia's assets.  (Separation Plan, § 2.04).

(d)      Notwithstanding any other provision of the Separation Plan, a Terminated Employee is not considered to have incurred an Employment Termination Date in any of the five circumstances set forth in § 3.01(b) of the Separation Plan.  Relevant to the present case, a Terminated Employee is not considered to have incurred an Employment Termination Date if employment is discontinued because of

(v)     a transfer to an affiliated business or the sale of Pharmacia or any portion thereof either through a sale or exchange of stock or assets, where the Employee has been offered a Comparable Position with the Company or the new employer.

(Separation Plan, § 3.01(b)(v)).

(e)     Under the Separation Plan, a Comparable Position means "employment with the Company or a successor employer in which the individual's level of responsibilities would not constitute a Demotion." (§ 2.06).  In the case of a Change in Control, the concept of Comparable Position does not include jobs requiring a relocation of more than 50 miles within the state, relocation to a different state, or the necessity of materially increased business travel. (*Id.*).  Demotion is defined in terms of the Pharmacia compensation guidelines and career-ladder. (§ 2.08).

(f)     A person's participation in the Separation Plan terminates and all benefits cease in certain circumstances, including the following:  "The Participant is offered a Comparable Position with the Company or with a new employer following a transfer or sale." (Separation Plan, § 3.03(d)).

8.     An Administrative Committee was invested with the full power, authority and discretion to construe, interpret, and administer the Plan.  After the occurrence of a Change in Control, however, the Administrative Committee "shall not have complete and final discretion and any court or other tribunal that adjudicates any dispute, controversy or claim arising between a Participant and the Company, an Affiliate or any successor to either, relating to or concerning the

-6-

provisions of this Plan, will apply a *de novo* standard of review to any determinations made by the Administrative Committee or its delegates."  (Separation Plan, § 6.03).

Stock Option Plan

9.    At all relevant times, plaintiffs Michael Land and Dennis Kane held options for the common stock of Pharmacia Corporation, issued to them pursuant to the Pharmacia Corporation 2001 Long-Term Incentive Plan (A.R. Ex. 3) as a consequence of their employment.

10.    After the Separation Plan was amended, Pharmacia Corporation issued to its employees a document entitled "Understanding Your Stock Options" (hereafter Stock Option Brochure).  (A.R., Ex. 4).  The Stock Option Brochure was issued in contemplation of the Pfizer acquisition.

11.    The Stock Option Brochure granted an extended period of three years in which an employee might exercise a stock option, if the employee experienced an "Acquisition Termination."  The Brochure defined the term "Acquisition Termination" as follows:

> In the United States, an Acquisition Termination is the termination of employment within two years following the acquisition that is either involuntary (other than for cause) or that is as a result of rejecting an offer of continued employment in a position that is not a Comparable Position (see the Separation Benefit Plan for definitions and other details).

(Stock Option Brochure at 10).  The exercise period of the stock options of any employee who experienced a termination of employment not meeting the definition of Acquisition Termination would be governed by the terms and provisions of the document that the employee received with the original stock option grant.  (Stock Option Brochure at 11).

<u>2003 Change in Control</u>

12.     On April 16, 2003, Pfizer, Inc. acquired Pharmacia Corporation, including its wholly owned subsidiary, Pharmacia Diagnostics, Inc. The transaction was structured by merging Pharmacia Corporation with a wholly owned acquisition subsidiary of Pfizer, Inc. named Pilsner Acquisition Sub Corp. (Suppl. Stip., ¶ 1).

13.     On closing the merger, "Pharmacia survived the merger as a wholly owned subsidiary of Pfizer." (Pfizer 8K Report, dated 4/16/03, found in Suppl. Stip., Ex. 1 at 2, docket # 62).

14.     As part of the merger, Pfizer, Inc. adopted and continued the Separation Plan. (*See* Minutes of Board of Directors of Pfizer, Inc. dated 12/16/02, found at A.R., Ex. 6). To administer the Separation Plan, Pfizer appointed an Advisory Group, which assumed the responsibilities of the Administrative Committee under the Separation Plan. (A.R., Ex. 7). The 2001 Long-Term Incentive Plan was likewise continued after Pharmacia became a subsidiary of Pfizer. (First Stip., ¶ 16).

15.     Pfizer's April 16, 2003 acquisition of Pharmacia Corporation constituted a "Change in Control" within the meaning of section 2.04 of the Separation Plan. (Suppl. Stip., ¶ 3). After the 2003 Change in Control, however, Pharmacia Corporation and its Separation Plan continued to exist. (*Id.*).

16.     After the Pfizer acquisition, plaintiffs Michael Land and Dennis Kane continued as employees of Pharmacia Corporation, then a wholly owned subsidiary of Pfizer, Inc.

17.     On July 1, 2003, Pfizer, Inc. issued a memorandum to all employees of Pharmacia Diagnostics, including plaintiffs. (A.R., Ex. 8). The memorandum prohibited inter-

divisional transfers by employees of Pharmacia Diagnostics to other operations of Pfizer, Inc. Plaintiffs were among the group of employees not permitted to apply for positions at Pfizer outside of the diagnostics business.  (First Stip., ¶ 17).

2004 Change in Control

18.    On January 17, 2004, Pfizer, Inc. entered into a Stock and Asset Purchase Agreement with Plum Acquisition Co., a Delaware corporation unaffiliated with Pfizer.  (A.R., Ex. 10).  Plum Acquisition Co. was established by Triton Ltd. and PPM Ventures as an acquisition vehicle for certain of the businesses and properties of Pfizer, Inc., including Pharmacia Diagnostics. In the Stock and Asset Purchase Agreement, the purchaser is required to offer continued employment in the same or a comparable position to every U.S. employee of Pharmacia.  (¶ 7.5).  Pursuant to the Stock and Asset Purchase Agreement, the business and assets of Pharmacia Diagnostics were transferred to the purchasing corporation effective April 2004.

19.    Both plaintiffs were offered and voluntarily accepted a job by the new owners of Pharmacia Diagnostics.  (First Stip., ¶ 22).  As of the closing of the sale, therefore, plaintiffs were terminated as employees of Pharmacia Corporation, a subsidiary of Pfizer, Inc.  (First Stip., ¶¶ 21, 22).

Plaintiffs' Pursuit of Administrative Remedies

20.    On April 14, 2004, Plaintiff Kane sent an e-mail to a member of the Pfizer Administrative Committee, Barry Westgate.  (A.R. Ex.11).  Plaintiff Kane, on behalf of himself and other individuals, sought to appeal certain determinations made under the Pharmacia Corporation 1996 and 2001 Long Term Incentive Plans related to the sale of the Diagnostics business.  Plaintiff

-9-

Kane also requested separation benefits under the Pharmacia Separation Benefit Plan.  (First Stip.,

¶ 23).

22. Westgate responded to Plaintiff Kane in a letter dated April 21, 2004, rejecting plaintiff's requests for relief.  (A.R. Ex. 12).

22. On May 26, 2004, plaintiffs' counsel sent a letter to Westgate appealing the Pfizer Administrative Committee's decision.  (A.R. Ex. 13).

23. Pfizer never provided plaintiffs with a denial of their appeal or any other process thereafter.  (First Stip., ¶ 26).

**Discussion**

I.    **Separation Plan**

A.    <u>Standard of Review</u>

The Pharmacia Separation Benefit Plan is governed by ERISA.  Section 1.01 of the Plan expressly states that the Plan is intended to constitute a formal employee welfare benefit plan under ERISA, and the Supreme Court has held that plans to pay employees severance benefits, payable only upon termination of employment, are employee welfare benefit plans under ERISA. *Massachussetts v. Morash*, 490 U.S. 107, 116 (1989).  Judge McKeague has also found that the Separation Plan meets the requirements for ERISA coverage under Sixth Circuit authority.  (Op., docket # 24, at 4-9).  It is now well-established that federal courts must review challenges to benefit determinations under the *de novo* standard, unless the ERISA plan itself gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan.  *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  In the present case, the Plan itself

-10-

strips the Administrative Committee of complete and final discretion after a change in control and provides that the *de novo* standard of review must apply to determinations made by the Committee. (Separation Plan, § 6.03).  In view of this provision, the parties agree that the *de novo* standard must be applied.

        B.    <u>Procedural Claim</u>

In addition to challenging the denial of their claim for benefits under the Separation Plan, plaintiffs challenge the procedure by which that denial was reached.  It is clear that an ERISA beneficiary has an independent cause of action for violation of the beneficiary's procedural rights under ERISA and the plan documents.  *See, e.g., Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 459 (6th Cir. 2003).  In the present case, plaintiffs contend that defendants violated the requirements of section 503 of ERISA, 29 U.S.C. § 1133, which require adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied and a reasonable opportunity for full and fair review.  Implementing regulations promulgated under section 1133 require that every claimant who is denied a claim for benefits must receive written notice setting forth the specific reason or reasons for the denial, with reference to the pertinent plan provisions on which the denial is based, in addition to other information.  29 C.F.R. § 2560.503-1(f). In the present case, it is undisputed that these requirements of law and regulation were violated, in that the Administrative Committee never provided plaintiffs with any administrative appeal, despite plaintiffs' request.  (First Stip., ¶ 26).

Although plaintiffs have established a clear procedural violation, the remedy for that violation is not apparent.  The Sixth Circuit has repeatedly held that procedural violations in ERISA

cases must be addressed by procedural remedies, and not substantive relief. *See Lake v. Metro Life Ins. Co.*, 73 F.3d 1372, 1378 (6th Cir. 1996); *Lewandowski v. Occidental Chem. Corp.*, 986 F.2d 1006, 1008 (6th Cir. 1993); *accord Bolone v. TRW Sterling Plant Pension Plan*, 130 F. App'x 761, 766 (6th Cir. 2005) (citing cases). In other words, a district court faced with a violation of procedural rights must remedy that violation by affording the claimant the appropriate process by which the claimant can establish the facts necessary to support his claim. The Sixth Circuit generally holds that the appropriate remedy for a violation of the provisions of section 503 is an evidentiary hearing in the district court or a remand to the plan administrator to allow the claimant to introduce the evidence that he would have presented in administrative proceedings, had they been properly afforded to him. *See, e.g., University Hospitals of Cleveland v. South Lorain Merchants Ass'n & Health & Welfare Benefit Plan & Trust*, 441 F.3d 430, 434 (6th Cir. 2006); *McCartha v. Nat'l City Corp.*, 419 F.3d 437, 444 (6th Cir. 2005); *VanderKlok v. Provident Life & Accident Ins. Co.*, 956 F.2d 610, 615-17 (6th Cir. 1992). Consequently, if plaintiffs in the present case had contended that they would have presented further factual support to the Committee if they had been afforded the appropriate administrative appeal, plaintiffs would be entitled to make their evidentiary showing in this court or on remand to the administrator. Plaintiffs, however, have not sought such relief. The facts underlying their claim are not disputed by defendants, and plaintiffs have never asked this court for an opportunity to establish any further facts in support of their claim under the Separation Plan. Further, plaintiffs have not identified any facts material to their ERISA claim that they would have attempted to establish, had their appeal been properly processed. The Sixth Circuit holds that a remand for further factual development is not required if it would represent a "useless formality." *McCartha*, 419 F.3d at 444; *Kent v. United Okla. Life Ins. Co.*, 96 F.3d 803, 807 (6th Cir. 1996).

Consequently, the only procedural relief available for the violation of plaintiffs' procedural rights would be unavailing in this case. The appropriate reaction to a failure to provide an appeal, in the circumstances of this case, is to deem plaintiffs' claim as denied at the administrative level and proceed to district court review. *See Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir. 1988) (citing 29 C.F.R. § 2560.503-1(h)(4)).

Plaintiffs suggest that the appropriate remedy for the procedural violation is to impose upon the Plan a *de novo* standard of review of its decision. This suggestion is legally deficient and practically unnecessary. Legally, the Sixth Circuit has repeatedly held that changing the standard of review is not the proper means of remedying a violation of a claimant's procedural rights. *See, e.g., University Hospitals*, 441 F.3d at 434; *Daniel*, 839 F.2d at 267 ("The standard of review is no different whether the appeal is actually denied or is deemed denied."). Practically, it is unnecessary for this court to impose a *de novo* standard of review as a remedy, even if it could do so, because the Plan itself clearly adopts this standard.

## C.   Review on the Merits

Count 3 of plaintiffs' second amended complaint presents a claim for benefits under the Separation Plan. Resolution of this claim requires the court to interpret the terms of the Plan. In doing so, the court must construe the ERISA plan with a view toward effectuating its general purpose. *See Wulf v. Quantum Chem. Corp.*, 26 F.3d 1368, 1374 (6th Cir. 1994). The court's analysis must begin with the "language of the Plan, the starting point for interpreting any written instrument." *Id.* ERISA plans should be interpreted "according to their plain meaning, in an ordinary and popular sense." *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 556 (6th Cir. 1998). In

-13-

doing so, the court should read the terms of the plan as would a person of average intelligence and experience. *Id.* Courts must give effect to the unambiguous terms of an ERISA plan when applying this analysis. *See Cassidy v. Akzo Nobel Salt, Inc.*, 308 F.3d 613, 617-18 (6th Cir. 2002). ERISA plans, like any other contract, must be construed as a whole.

The Separation Plan is carefully drafted, and its terms are unambiguous with regard to the dispute presently before the court. Article II of the Separation Plan defines a number of relevant terms, while Article III, by use of those terms, creates eligibility and exclusions from eligibility for separation benefits. Although proper construction of these provisions takes some care, ultimately the intent of the Plan is clear and not subject to dispute.

Section 3.01(a) of the Separation Plan creates a rule of inclusion by providing that any Terminated Employee whose services are terminated by reason of a Termination Due to Change in Control is a Participant. Each of the capitalized terms was previously defined in Article II. A Terminated Employee is an employee who has experienced an Employment Termination Date. (§ 2.23). An Employment Termination Date is the date upon which "the employment by the Employee by the Company is involuntarily terminated." (§ 2.12). A Termination Due to Change in Control means a termination of an Employee's "employment by the Company within two years following a change in control that is involuntary or that is as a result of his or her rejection of an offer of continued employment with the Company or an affiliate if such employment is not a Comparable Position." (§ 2.24). Application of these provisions to the undisputed facts surrounding the 2004 acquisition leads to the conclusion that plaintiffs were Participants of the Plan for purposes of section 3.01(a). The Plan provisions work together to create this result, as follows:

-14-

- It is undisputed that the 2004 acquisition was a Change in Control within the meaning of section 2.04 of the Plan.

- It is also undisputed that plaintiffs' employment by the Company was terminated within two years of the 2004 Change in Control.  (First Stip., ¶ 22).  In fact, employment by Pharmacia was terminated simultaneously with the 2004 Change in Control.  Consequently, both plaintiffs suffered a Termination Due to Change in Control within the meaning of section 2.24.

- Under the rule of inclusion created by section 3.01(a) of the Plan, as Terminated Employees whose services were terminated by reason of Termination Due to Change in Control, plaintiffs must be deemed Participants of the Plan.

What section 3.01(a) giveth, however, section 3.01(b) taketh away.  Section 3.01(b) frames a rule of exclusion by providing that, "notwithstanding anything herein to the contrary," a Terminated Employee does not incur an Employment Termination Date if his employment is discontinued due to

> (v)     a transfer to an affiliated business or the sale of Pharmacia or any portion thereof either through a sale or exchange of stock or assets, where the Employee has been offered a Comparable Position with the Company or the new employer.

(Separation Plan, § 3.01(b)).  In other words, even though an Employee may be included as a Plan Participant under section 3.01(a), that Employee is excluded from participation if his Termination from Employment arises from the sale of Pharmacia or any portion thereof (whether by sale of stock or assets), where the Employee has been offered a comparable position, either with Pharmacia or the

-15-

new employer.  Under the undisputed facts of this case, plaintiffs are excluded by the provisions of section 3.01(b)(v), because:

•     Their employment was discontinued because of a Termination Due to Change in Control;

•     The Change in Control arose from the sale of a portion of Pharmacia [the Diagnostics Division];

•     Through a sale of assets;

•     Where plaintiffs were offered Comparable Positions;[2]

•     With the new employer [Triton Ltd.].

Furthermore, even if the exclusion created by section 3.01(b) were deemed inapplicable, the Termination of Benefits provision (§ 3.03) would create the same result.  Under section 3.03, a Participant "shall cease to participate in the Plan, and all benefit payments shall cease," upon the occurrence of a number of listed events, including the following:

      (d)     The Participant is offered a Comparable Position with the Company or with the new employer following a transfer or sale.

(Separation Plan, § 3.03(d)).  It is undisputed that both plaintiffs were offered comparable positions with the new employer following the 2004 asset sale.  Therefore, even if plaintiffs are deemed to have somehow escaped the exclusion of section 3.01(b)(v), their eligibility for benefits would have terminated instantaneously, because they were offered Comparable Positions as part and parcel of the 2004 acquisition.

In urging a contrary result, plaintiffs present several arguments, all of them fallacious. Each argument is dealt with in turn.

_____

     [2] Plaintiffs have not asserted that the jobs they accepted after the 2004 Change in Control were not comparable to their former positions.

-16-

*The "Company" Refers only to Pharmacia Before the 2003 Acquisition by Pfizer.*
Section 2.05 of the Plan defines the word "Company" as Pharmacia and its affiliates.  Plaintiffs
contend that this definition refers only to Pharmacia before the 2003 acquisition by Pfizer.  In this
way, plaintiffs argue that Pharmacia Corporation (a wholly owned subsidiary of Pfizer, Inc. after the
2003 acquisition) cannot be deemed "the Company" under any of the provisions of the Plan after
April 2003.  This argument finds no basis in law or in the words of the Plan.  Section 2.05 clearly
defines the word "Company" as Pharmacia.  Nothing happened in 2003 to change the plain meaning
of this term, which referred to Pharmacia Corporation both before and after the acquisition of its
stock by Pfizer.  The 2003 transaction was merely a purchase of stock.  On closing the merger,
"Pharmacia survived the merger as a wholly owned subsidiary of Pfizer." (Pfizer 8K Report, Suppl.
Stip., Ex. 1 at 2, docket # 62).  Plaintiffs were employed by Pharmacia both before and after the 2003
stock acquisition.  Pharmacia Corporation did not cease to exist as a result of the 2003 acquisition.

There is no warrant in the Plan language for restricting the definition of Company,
as set forth in section 2.05 and then used throughout the Plan, to Pharmacia before the 2003 purchase
of its stock by Pfizer.  Although the purchase of Pharmacia stock by Pfizer was indeed a "Change
in Control" within the meaning of section 2.04, Pharmacia Corporation (as a wholly owned
subsidiary of Pfizer) continued to exist and therefore, by the plain meaning of section 2.05, continued
to be the "Company."  Plaintiffs' position is that, after a change in control, Pharmacia, although still
in existence, no longer qualifies as the "Company" under the Plan, and that Pfizer is making an
unsupportable attempt to "stand in the shoes" of Pharmacia.  There is no need for Pfizer to stand in
Pharmacia's shoes.  Pharmacia was plaintiffs' employer both before and after the 2003 acquisition.

The Plan does not state or imply that the term "Company" refers to Pharmacia only before a Change in Control. In fact, such a reading of the Plan would lead to anomalous and even ridiculous results. For example, section 2.24 of the Plan defines "Termination Due to Change in Control" as termination of an Employee's employment "by the Company within two years following a Change in Control. . . ." This clearly contemplates that, even two years after a Change in Control, the "Company" remains the Company. Later in section 2.24, it is contemplated that the "Company" may make an offer of continued employment after a Change in Control. Again, if the Company ceases to exist upon a Change in Control, this provision is rendered meaningless, as the Company could not possibly offer continued employment after it ceases to exist.

In short, plaintiffs attempt a sleight of hand by insisting that the "Company" means Pharmacia before the 2003 acquisition. The carefully drafted provisions of the Plan are not a bit ambiguous on this point. As long as Pharmacia Corporation existed, in whatever form, and it employed plaintiffs, Pharmacia Corporation was the "Company" under the Plan. This was true both before and after the 2003 acquisition.

*An Employee Terminated Within Two Years of the 2003 Acquisition Automatically Qualifies for Benefits.* In a related argument, plaintiffs read section 2.24 as a guarantee of separation benefits to any Employee who was terminated by Pharmacia within two years of the 2003 acquisition by Pfizer. Again, plaintiffs rely on the undisputed fact that the 2003 acquisition was a Change in Control within the meaning of section 2.04. This fact, however, does not equate to a guarantee of benefits. Because the 2003 acquisition by Pfizer was a Change in Control, any employee involuntarily terminated by Pfizer within two years thereafter certainly did experience a

-18-

"Termination Due to Change in Control" within the meaning of section 2.24. This termination from employment would indeed be sufficient to trigger the rule of inclusion of section 3.01(a). Plaintiffs are nevertheless faced, however, with the rule of exclusion of section 3.01(b), which they steadfastly ignore. In other words, the rule of inclusion of section 3.01(a) may be viewed as triggered in this case by two separate predicate occurrences: (a) plaintiffs' termination from Pharmacia's employment within two years of the 2003 Change in Control; and (b) their immediate termination as a result of the 2004 Change in Control. Therefore, the rule of inclusion of section 3.01(a) was clearly triggered, not once but twice. Plaintiffs are still left with the fact that they were offered a comparable position immediately by the new employer, which excluded them from eligibility for benefits under section 3.01(b).

*The General Intent of the Plan*. Plaintiffs rely heavily on the general intent of the Plan, which they contend was to protect Pharmacia employees from anticipated predations by Pfizer after the anticipated 2003 acquisition. Plaintiffs assert that the intent of the Plan was to vest employees with an indefeasible right to benefits as a consequence of the 2003 acquisition, and that any termination within two years thereafter would trigger benefits, regardless of the offer of a comparable position by the new employer. The Plan, as shown above, simply cannot bear this interpretation. Plaintiffs instead rely on numerous, disparate provisions of the Plan, which indeed anticipated the acquisition and strengthened the rights of employees thereafter. For example, as noted above, after the 2003 Change in Control, employees were entitled to review under the more favorable, *de novo* standard of review, by virtue of the express provisions of section 6.03 of the Separation Plan. Such provisions, whether considered separately or as a whole, cannot bear the

weight that plaintiffs would put on them.  Plaintiffs essentially argue that these provisions evidence an intent that employees must prevail in all circumstances when they seek Plan benefits within two years of the Pfizer acquisition.  The express provisions of the Plan governing eligibility for benefits, as set forth in articles II and III, lead to a much different conclusion.  Furthermore, if one were to consult section 1.02, which expressly sets forth the purpose of the Plan, the intent appears to be to "alleviate in part or in full financial hardships which may be experienced by certain of the employees of Pharmacia. . . ."  "In essence, benefits under the Plan are intended to be supplemental unemployment benefits." (*Id.*).  It is undisputed that plaintiffs did not experience even one day of unemployment and suffered no financial hardships as a result of either the 2003 or 2004 Changes in Control.  Plaintiffs never qualified for unemployment benefits, because they were never unemployed.  Consequently, to the extent that a court must resort to the "atmospherics" of the Plan to discern its intent, the intent was to aid those who were truly unemployed, not to confer a windfall on employees who never experienced any adverse effects from the acquisitions.

*Ambiguous Plan Provisions Must Be Construed Against the Drafter*.  Finally, plaintiffs invoke the rule of *contra proferentem*, under which ambiguous provisions of an ERISA plan are construed against the drafter.  *See Marquette General Hosp. v. Goodman Forest Indus.*, 315 F.3d 629, 632 n.1 (6th Cir. 2003).  The *contra proferentem* rule, however, applies only if the terms of the Plan are ambiguous, that is, susceptible to more than one interpretation.  *Id.*  As found above, the Separation Plan was carefully drafted and its eligibility provisions are not subject to more than one interpretation.  Plaintiffs are therefore not aided by the *contra proferentem* rule in this case.

In summary, plaintiffs' claims under the Separation Plan are founded upon strained and sometimes nonsensical constructions of the provisions of the Separation Plan. Plaintiffs' claims for benefits are clearly defeated by the rule of exclusion created by sections 3.01(b)(v) and 3.03(d) of the Plan, and plaintiffs have no cogent argument to the contrary. Upon *de novo* review of the denial of benefits under the Separation Plan, I conclude that denial was appropriate and therefore recommend that judgment be entered in favor of defendants on count 3 of the second amended complaint.

## II.    Stock Option Plan

Count 4 of the second amended complaint asserts a claim for an extended stock option exercise period. This claim arises from the provisions of the Stock Option Brochure (A.R. Ex. 4), issued by Pharmacia in anticipation of the 2003 acquisition. Neither the underlying Stock Option Plan nor the Stock Option Brochure are governed by ERISA. Judge McKeague nevertheless determined that plaintiffs' claims under the Stock Option Brochure "relate to" the ERISA Separation Plan by reason of a reference in the Stock Option Brochure to the Separation Plan for "definitions and other details." (Op. at 9-13, docket # 24).

Under Judge McKeague's preemption ruling, plaintiffs' claims under count 4 must be judged by the rules of construction applicable to ERISA plans. Application of the ERISA rules of construction, however, does not affect the outcome of this case, because the ERISA rules are consistent with general rules of contract interpretation under state law. *See Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 556 (6th Cir. 1998). The Sixth Circuit has recently emphasized that the ERISA rules of contract interpretation mirror those applied by the Michigan courts in contract cases. *See*

*Citizens Ins. Co. of Am. v. MidMichigan Health ConnectCare Network Plan*, No. 05-1237, 2006 WL

1492168, at * 3, ___ F.3d ___ (6th Cir. June 1, 2006).  Consequently, the outcome on count 4 would

be the same whether the court applies *de novo* review under ERISA principles or applies Michigan

law, which, like ERISA law, requires that a court give the words of a contract "their plain and

ordinary meaning that would be apparent to a reader of the instrument."  *Rory v. Continental Ins.

Co.*, 703 N.W.2d 23, 28 (Mich. 2005).  The court must "construe and apply unambiguous contract

provisions as written."  *Id.* at 26.

        The relevant portions of the Stock Option Brochure purport to extend the exercise

period for most outstanding stock options for those employees who experience an "Acquisition

Termination."  (Stock Option Brochure at 10).  The relevant portion of the Stock Option Brochure

deals with this issue in two sentences:

> The chart below reflects the post-termination exercise period for most outstanding
> options if you experience an Acquisition Termination.  In the United States, an
> Acquisition Termination is the termination of employment within two years
> following the acquisition that is either involuntary (other than for cause) or that is as
> a result of rejecting an offer of continued employment in a position that is not a
> Comparable Position (see the Separation Benefit Plan for definitions and other
> details).

(Stock Option Brochure at 10).

        Unlike the Separation Plan, which was carefully drafted, the Stock Option Brochure

is poorly drafted, and even cryptic.  The Stock Option Brochure grants an extended exercise period

for those employees experiencing an "Acquisition Termination."  This term is unique to the Stock

Option Brochure and does not appear anywhere in the Separation Plan.  The Separation Plan does

not purport to define the terms Termination or Acquisition Termination.  Consequently, despite the

reference to the Separation Plan for "definitions and other details," the Separation Plan does not and

-22-

cannot shed any light on the question whether a particular employee has or has not experienced an Acquisition Termination.  The Stock Option Brochure, which is the sole source of the definition of this term, establishes only two prerequisites to a finding of an Acquisition Termination:  (1) a termination from employment within two years following an acquisition; (2) that is (a) involuntary (other than for cause); *or* (b) comes as a result of the rejection of an offer of continued employment in a position that is not a Comparable Position.  The only term found in the Stock Option Brochure that is defined in the Separation Plan is the term "Comparable Position."

It is therefore incorrect to conclude that the Stock Option Brochure and the Separation Plan are *in pari materia* or that entitlement to an extended exercise period under the Stock Option Brochure is dependent upon an employee's status as a Participant in the Separation Plan.  Defendants nevertheless argue "By its plain terms, therefore, the longer exercise period turns on whether the employee is qualified to receive severance benefits under the Separation Plan."  (Def. Brief at 14, docket # 53).  This is wishful thinking.  The Stock Option Brochure does not state or imply such a result.  The Brochure could have easily said that an employee is entitled to an extended stock option exercise period only if that employee is entitled to separation benefits under the Separation Plan.  The Brochure, however, says nothing of the sort.  The parenthetical reference to the Separation Plan for "definitions and other details" is virtually meaningless.  As noted, the only term used on page 10 of the Brochure that is defined in the Separation Plan is the term Comparable Position.  To that extent, the court would be bound to give the term Comparable Position the same meaning when construing both documents, but that term is undisputed.  Beyond that, the Separation Plan does not purport to govern in any fashion eligibility for an extended stock option exercise.

-23-

Application of the undisputed facts to the definition of Acquisition Termination found on page 10 of the Brochure leads to the conclusion that plaintiffs did in fact experience an Acquisition Termination for purposes of the Stock Option Brochure, even though they were not entitled to benefits under the Separation Plan.  It is undisputed that:

•       Plaintiffs' employment with Pharmacia was terminated in connection with the 2004 acquisition;

•       The termination took place within two years of the acquisition; and

•       The termination was involuntary.

Unlike the Separation Plan, the Stock Option Brochure contains no rule of exclusion for those employees who are hired by a new employer after the acquisition, and nothing in the Brochure warrants importation of the exclusionary language found in section 3.01(b) of the Separation Plan.   Section 3.01(b) provides that a Terminated Employee does not incur an Employment Termination Date in certain enumerated circumstances.  The Stock Option Brochure, however, does not use the term Employment Termination Date.  No ordinary reader (or sophisticated reader, for that matter) could possibly construe the terse reference to the Separation Plan as providing a rule of exclusion for the Stock Option Plan.  In short, plaintiffs have clearly experienced an Acquisition Termination within the meaning of the Stock Option Brochure, and the Brochure's cryptic reference to the Separation Plan "for definitions and other details" is insufficient to alter this result.

For the foregoing reasons, I conclude that plaintiffs are entitled to judgment on count 4, declaring that they are entitled to three-year exercise periods for their stock option grants.

### III.     Pfizer, Inc. as a Defendant

In its brief, Pfizer, Inc. asserts that it is not a proper party in an ERISA case.  (Def. Brief at 8, docket # 53).  This argument is meritorious with regard to the claim under the Separation Plan, but it is not a good defense to the claim for an extended stock option period.

As a general matter, the proper party in a suit for recovery of benefits under an ERISA plan is the plan itself.  *See Daniel v. Eaton Corp.*, 839 F.2d 263, 266 (6th Cir. 1988).  In its brief, defendant Pfizer, Inc. raised this principle and argued that as the employer, it was not a proper party to the ERISA action.  Although plaintiffs filed a reply brief (docket # 54), that brief ignored the issue.  At oral argument, however, plaintiffs' counsel asserted for the first time that it is liable as the defendant because the Plan is unfunded and subject to Pfizer's *de facto* control.  An employer may be sued under ERISA if it controls a plan.  *Daniel*, 839 F.2d at 266.  In the present case, however, plaintiffs have not pleaded, briefed, or proved facts sufficient to invoke this theory of liability.  I therefore recommend that judgment be entered for defendant Pfizer, Inc. on count 3, arising under the Separation Plan, on this alternative ground.

This principle, however, is not applicable to count 4, which asserts a claim under the Stock Option Brochure.  As noted above, no party contends that the stock option program is an ERISA plan.  It would therefore be impossible for plaintiffs to sue any plan as an entity on this claim, as none exists.  As the result of the 2003 acquisition, plaintiffs' Pharmacia stock options were converted into stock options to purchase shares of Pfizer, Inc. (Stock Option Brochure at 7).  Pfizer, Inc. is therefore the only appropriate defendant on count 4.

**Recommended Disposition**

For the foregoing reasons, I recommend that judgment be entered in favor of defendants on count 3. I further recommend that judgment be entered in favor of plaintiffs on count 4, declaring that they have a three-year period in which to exercise their stock options.


Dated:   June 12, 2006                          /s/  Joseph G. Scoville
                                                United States Magistrate Judge


**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Neuman v. Rivers*, 125 F.3d 315, 322-23 (6th Cir.), *cert. denied*, 522 U.S. 1030 (1997); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).